**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

| | |
|---|---|
| United States of America, | Crim. No. 20-233 (JRT/BRT) |
| Plaintiff, | |
| v. | **REPORT AND RECOMMENDATION** |
| Siarra Iris Dawn Gallegos, | |
| Defendant. | |

Melinda A. Williams, Esq., United States Attorney's Office, counsel for Plaintiff.

Jordan S. Kushner, Esq., Law Office of Jordan S. Kushner, counsel for Defendant.

BECKY R. THORSON, United States Magistrate Judge.

This matter came before the Court on October 19, 2021, for a hearing before the Honorable District Judge Katherine M. Menendez—then Magistrate Judge—on various pretrial motions filed by Defendant Siarra Iris Dawn Gallegos. (Doc. No. 138.) Magistrate Judge Menendez ruled on Defendant's non-dispositive motions. (Doc. No. 149.) The case was then transferred to the undersigned on December 22, 2021, because of the elevation of Judge Menendez to District Judge. (Doc. Nos. 150, 151.) Remaining before the Court is Defendant's dispositive Motion to Suppress Statements. (Doc. No. 130.) Following the hearing, and after transfer to the undersigned, Defendant's Motion to Suppress Statements was fully briefed.[1]

---

[1] On October 19, 2021, Magistrate Judge Menendez held an evidentiary hearing and ordered post-hearing briefing on Defendant's dispositive motion. (Doc. No. 138.) Before

Defendant is charged in the Indictment with one count of conspiracy to commit wire fraud in violation of 18 U.S.C. §§ 1341, 1349, and 2326 and several counts of wire fraud in violation of 18 U.S.C. §§ 1349 and 2326, all stemming from her alleged participation in a telemarketing scheme. (Doc. No. 16, Redacted Indictment.) Defendant seeks to suppress statements made to law enforcement on February 19, 2021, when several agents interviewed her in her home. (Doc. No. 144, Def.'s Post-Hearing Mem. in Supp. of Mot. to Suppress Statements ("Def.'s Mem.").) The Government opposes. (Doc. No. 161, Gov't.'s Post-Hearings Resp. to Def.'s Mot. to Suppress Statements ("Gov't. Resp.").) For the reasons stated below, this Court recommends that Defendant's Motion to Suppress Statements (Doc. No. 130) be denied.

---

post-hearing briefing was completed, the case was reassigned to the undersigned on December 22, 2021. (Doc. Nos. 150–51.) On December 28, 2021, the undersigned issued a Text-Only Order amending the briefing schedule, which stated:

> The Court will review the transcript of the hearing held on October 19, 2021, and the post-hearing briefs, to determine whether this Court believes that another hearing on the dispositive motion (Doc. No. 130) is necessary. However, if either party believes another hearing is necessary due to the December 22, 2021, reassignment to the undersigned, please file a letter brief by January 4, 2022.

(Doc. No. 154.) On January 3, 2022, Defendant's counsel filed a letter opposing another hearing. (Doc. No. 155.) Defendant's counsel also requested that Judge Menendez decide Defendant's Motion to Suppress Statements because she was "the only judicial officer who had an opportunity to observe the witnesses' testimony and fully assess the credibility of the witnesses" when she presided over the October 19, 2021, evidentiary hearing. (*Id.*) Having reviewed the completed briefing and the record—including the full transcript of the witnesses' testimony—this Court finds that another hearing is unnecessary and Defendant's request at Doc. No. 155 is denied.

2

I.  **FACTS**

FBI Special Agents Jazmin Vidana and Scott Zelesnikar went to Defendant's home on February 19, 2021, to interview her and request consent for a search of her home office. (Tr. 24–26.) They were acting on a request from special agents in Minnesota and were provided with a series of questions to ask. (*Id.*) With them were three other agents: FBI Special Agents Steve Harrison and Young Lee, as well as postal inspector Lisa Cummins. (Tr. 26.) The FBI agents wore windbreaker jackets with the FBI logo and the postal inspector wore a USPS version of that jacket. (Tr. 27, 62.) While the agents were carrying their weapons, they were not visible. (Tr. 27–28.)

Special Agent Vidana testified that she and Special Agent Zelesnikar knocked or rang the doorbell. (Tr. 29.) Thaddeus Acosta, Defendant's fiancé, heard a knock and then the doorbell. (Tr. 61–62.) When Mr. Acosta opened the door, he saw several agents, three at the door, and others in the yard. (Tr. 62.) Mr. Acosta testified that he asked the reason for the agents' visit, and the agents told him they wanted to speak with Defendant about her employment. (Tr. 63.) Mr. Acosta "asked the agents if Ms. Gallegos was in any kind of trouble," and the agents said she was not. (*Id.*) Mr. Acosta then asked the agents if he could close the door while he went to retrieve Defendant, who was upstairs. (Tr. 63, 67–68.) The agents said that would be fine. (*Id.*) Mr. Acosta closed the door, walked upstairs, and told Defendant that the agents wanted to ask her about her employment. (Tr. 63.) According to Mr. Acosta, Defendant appeared "pretty alarmed." (Tr. 63.) Mr. Acosta asked her to calm down. (*Id.*) He told her the agents said she was "not in any trouble" and that it seemed like they just wanted to ask her some questions. (Tr. 66–67.)

3

Defendant walked with Mr. Acosta downstairs to speak with the agents from the entryway of the door. (Tr. 29, 33, 63–64.) Special Agent Vidana and the other agents introduced themselves. (Tr. 29.) Special Agent Vidana testified that Defendant appeared "very nervous to see us"; her hands shook, her voice was "very shaky"; she "looked like she was going to tear up or cry"; and "her thoughts seemed very scattered." (Tr. 29, 45.) Mr. Acosta also testified that Defendant was "[s]tartled and scared" as well as "[n]ervous." (Tr. 65.)

Mr. Acosta testified that the agents told Defendant that they "just wanted to speak with her about her employment if she would step outside." (Tr. 64.) Defendant stepped outside. (*Id.*) Defendant "was so nervous" that the agents asked her to sit down outside the door and try to take a deep breath. (Tr. 29–30.) Mr. Acosta then asked the agents to "come inside because it was quite the scene in [their] front yard." (Tr. 32, 64.) Special Agents Vidana and Zelesnikar entered the living area and sat on the couch with Defendant, while other agents stood throughout the living room. (Tr. 32.) Special Agent Vidana testified that once on the couch, Defendant seemed "a lot more relaxed." (Tr. 33.)

Mr. Acosta testified that he heard the agents tell Defendant "quite a few times" that "she wasn't in any kind of trouble." (Tr. 65.) To Mr. Acosta, it appeared that the agents "were insistent on relaxing her to the point where she was comfortable talking." (*Id.*) He later testified about this interaction:

> [DEFENDANT'S COUNSEL]: So when you say -- so they told her at the beginning to calm her down; is that right?
>
> [MR. ACOSTA]: Yeah, they definitely told her that she was in no kind of trouble, they just wanted to ask her some questions about her employment

4

multiple times.

[DEFENDANT'S COUNSEL]: And so they did tell her multiple times she was not in trouble?

[MR. ACOSTA]: Yes, sir. I believe the proper words were you're not in any kind of trouble.

[DEFENDANT'S COUNSEL]: That was what they repeated?

[MR. ACOSTA]: Yeah.

[DEFENDANT'S COUNSEL]: And did that have an effect on her demeanor?

[MR. ACOSTA]: Yeah, definitely had an effect on her. I think it calmed her down drastically. She's not really the type to do well under pressure, so that definitely calmed her down to the point where she was willing to speak with them without really being scared.

[DEFENDANT'S COUNSEL]: And so from your perception, then, did that affect her willingness to speak with them?

[MR. ACOSTA]: It most definitely did. Yes.

[DEFENDANT'S COUNSEL]: And in what way did it affect her willingness?

[MR. ACOSTA]: It made her calm. It calmed her down. It put her nerves at ease I would say.

[DEFENDANT'S COUNSEL]: And, as a result, she agreed to speak with them?

[MR. ACOSTA]: Yes, sir.

(Tr. 65–66.)

At the hearing, Special Agent Vidana testified that she did not know if Defendant was a target of the investigation or just a witness who needed to be interviewed. (*Id.*) After several questions from Defendant's counsel asking if Special Agent Vidana knew

5

whether or not Defendant was in trouble, the Court intervened, stating: "Special Agent Vidana, did you know whether she was in trouble at the time that you told her that she-- might have told her that she was not in trouble?" (Tr. 49.) Agent Vidana answered,

> In trouble in the sense of are you going to be arrested today? I know we did not have an arrest warrant, and I know that we did not have a search warrant. I was not aware of her involvement in the case or in the scheme, so I could not say that she was going to be arrested, you know. Depending on what she told me, I didn't know what she—what was going to happen later, if she was going to be in trouble afterwards.

(Tr. 49–50.)

Mr. Acosta testified that during the agent's interview of Defendant, the agents' tone was "fairly friendly," though there were moments where, according to him, the tone "was a little less than friendly" and sometimes "rude" but "definitely not a tone of screaming or yelling" and no "threats" were made. (Tr. 69, 73, 74.) At no time during the interview did the agents scream, yell, make threats, raise their voice, or point weapons. (Tr. 27–28, 33–34, 70.) And none of the agents blocked the door. (Tr. 32–33.) In addition, no one said or implied that Defendant could not leave or had to talk to the agents. (Tr. 33.) Special Agent Vidana testified that during the interview, she specifically talked about the interview being voluntary. (Tr. 38.) Special Agent Vidana also testified that she "told [Defendant] she didn't have to answer questions she didn't want to answer." (Tr. 39.) After that, according to Special Agent Vidana, they "went down [their] list of questions and she answered . . . all of them if not most." (*Id.*)

Mr. Acosta testified that at one point, he was "led" by one of the agents into the kitchen area away from the living area where the agents were conducting their interview

6

with Defendant, but he made his way back and forth from the kitchen area to the living room a few times. (Tr. 34, 71–72.) Mr. Acosta remained "within earshot" of the interview and heard at least "95 percent" of it. (Tr. 72.) At the hearing, Special Agent Vidana testified that she kept Mr. Acosta nearby to make Defendant comfortable. (Tr. 35.)

During the interview, Defendant "identified her own voice on four recorded phone calls" and provided information about her work and job. (Tr. 39.) She denied committing any fraud.[2] (*Id.*) After the interview, the agents asked Defendant for her consent to search her home office. (Tr. 40.) Defendant refused and the agents left. (Tr. 40, 55.) About an hour after the interview, Defendant called Special Agent Vidana and, having changed her mind, told Special Agent Vidana that the agents could come the next day to search her home office. (Tr. 40–41.) Defendant also provided the agents with "lead lists" she had received via email. (Tr. 40–41, 55, 78.) Later that same evening, Defendant called Special Agent Vidana again and said she had spoken with an attorney and no longer wanted to allow the agents to search her home office. (Tr. 41.)

## II.   ANALYSIS

Defendant Gallegos argues that her statements made to law enforcement on February 19, 2021, should be suppressed on the grounds that the agents overbore her will

---

[2] After the interview, agents noticed a large gun safe and, "just because they really love guns," began to ask Acosta what kind of guns he was into. (Tr. 39–40, 51–52, 78.) Mr. Acosta opened the safe and showed them. (Tr. 40.) According to Special Agent Vidana, "[h]e had a rapport type of discussion about guns because they're both into guns" and it was a "very friendly" conversation between "gun guys nerding out on guns." (Tr. 40, 42.)

such that her statements were rendered involuntary. (Def.'s Mem. 6.) In response, the Government argues that the totality of the circumstances demonstrate that Defendant's will was not overborne and that Plaintiff made her statements voluntarily. (Gov't. Resp. 8.)

"A statement is involuntary when it was extracted by threats, violence, or express or implied promises sufficient to overbear the defendant's will and critically impair his capacity for self-determination." *United States v. Boslau*, 632 F.3d 422, 428 (8th Cir. 2011) (quotations and citations omitted). "We discern whether a confession is voluntary under the totality of the circumstances, examining both the conduct of the officers and the characteristics of the accused," including "the degree of police coercion, the length of the interrogation, its location, its continuity, and the defendant's maturity, education, physical condition, and mental condition." *Id.* Whether a confession is voluntary under the totality of circumstances "is based on the objective circumstances of the interrogation, not on the subjective views harbored by either the interrogating officers or the person being questioned." *United States v. LeBrun*, 363 F.3d 715, 720 (8th Cir. 2004) (quotations and citations omitted).

Defendant Gallegos asserts that the "FBI's fraudulent method of obtaining Ms. Gallegos' statements render them involuntary" and the "evidence clearly establishes that Ms. Gallegos agreed to answer FBI agents' questions because they assured her that she was not in any trouble." (Def.'s Mem. 5–6.) According to Defendant, the "conduct of the agents" and their "deliberate deception" rendered her statements involuntary because they communicated a promise of leniency, which induced Defendant's cooperation. (*Id.* at 6–

8

8.) But the "mere fact that an officer may have elicited a confession through a variety of tactics" including "making false promises" and "deceiving the suspect," does not render a confession involuntary unless the overall impact causes "the defendant's will to be overborne." *Boslau*, 632 F.3d at 428–29.

A promise of some form of leniency does not alone make a confession involuntary. *See United States v. Kilgore*, 58 F.3d 350, 353 (8th Cir. 1995). In *Kilgore*, postal inspectors investigating a case of mail theft made assurances to the defendant that he would not go to jail if he confessed to the theft. *Id.* Defendant later argued on appeal that the "district court failed to take into account the coercive effect of the postal inspector's assurances" in causing him to confess, specifically that "he would not go to jail" and he would be able to "retrieve his personal vehicle." *Id.* The Eighth Circuit held that even assuming the postal inspectors had promised some form of leniency that the defendant would not go to jail, such a "circumstance alone would not make [the defendant's] confession involuntary." *Id.*; *see also Simmons v. Bowersox*, 235 F.3d 1124, 1133 (8th Cir. 2001) ("Although a promise made by law enforcement is a relevant consideration in assessing police conduct, it is only one circumstance to be considered and does not render a confession involuntary per se."); *Tippitt v. Lockhart*, 859 F.2d 595, 598 (8th Cir. 1988) (concluding that defendant's confession was voluntary despite officers' promise). Thus, as in *Kilgore*, even assuming that a reasonable person would view the agents' statements here as a promise that she would not be prosecuted, "a promise made by law enforcement does not render a confession involuntary per se" and "is merely one factor in the totality of the circumstances." *LeBrun*, 363 F.3d 715, 725

9

(quotations and citations omitted).

Defendant argues that the "agents' deception of Ms. Gallegos and its effect" in this case "are more direct than in comparable cases where the 8th Circuit held confessions to be voluntary." (Def.'s Mem. 7–8 (citing *LeBrun*, 363 F.3d 715; *United States v. Astello*, 241 F.3d 965 (8th Cir. 2001); *Boslau*, 632 F.3d 422; and *United States v. Brave Heart*, 397 F.3d 1035 (8th Cir. 2005)).) But Defendant's argument ignores the totality of circumstances analysis discussed in those cases. As stated in *LeBrun*, "it is not enough to show that the authorities' representations were the but-for cause of a confession." 363 F.3d at 725. Even where law enforcement use "tactics such as subjecting a suspect to psychological pressure, making false promises, playing on a suspect's emotions, and using his family against him," such tactics do not render a confession involuntary unless the totality of circumstances shows the defendant's will was overborne. *United States v. Astello*, at 967–68; *see also Boslau*, 632 F.3d at 428–29 (concluding that "a variety of tactics . . . does not render a confession involuntary unless the overall impact of the interrogation causes the defendant's will to be overborne") (citing *Brave Heart*, 397 F.3d at 1041). Thus, even if this Court assumes that the agents made assurances to Defendant that she was not "in trouble" and would not be arrested, knowing that she might later be prosecuted[3] does not render her statements "involuntary unless the overall impact of the

---

[3]     Special Agent Vidana testified under oath that she did not know whether Defendant was a witness or a target in the investigation. (Tr. 49–51.) Defendant, however, appears to question the veracity of Special Agent Vidana's testimony, pointing to Magistrate Judge Menendez's instructions at the hearing:

10

interrogation caused the defendant's will to be overborne." *Boslau*, 632 F.3d at 428–29 (quotation and citation omitted); *see also Jenner v. Smith*, 982 F.2d 329, 334 (8th Cir. 1993) (noting that deception does not render a confession involuntary unless the overall impact of the interrogation caused the defendant's will to be overborne). Accordingly, the agents' assurances to Defendant that she was not in trouble do not render her statements involuntary per se and are merely one factor in the totality of the circumstances.

With that one factor in mind, this Court considers other factors in the totality of

---

> [THE COURT]: Special Agent Vidana, I'm going to ask you to answer the question, which was the simple lack of an arrest or an arrest warrant in white-collar cases doesn't mean one way or the other whether someone is in trouble; is that correct or not?
>
> [SPECIAL AGENT VIDANA]: That is correct.
>
> [THE COURT]: Thank you. These questions are not tricky. And I'm going to ask you to answer them directly based on your experience. You don't have to agree to something that's not true. But stop trying to split the hairs if you don't mind, please.
>
> [SPECIAL AGENT VIDANA]: Okay. Understood.

(Tr. 50–51.) This Court has carefully reviewed the entire transcript of the October 19, 2021 hearing. Noteworthy is Judge Menendez's question to Special Agent Vidana: "Special Agent Vidana, did you know whether she was in trouble at the time you told her that she—might have told her that she was not in trouble?" (*Id.* at 49.) Special Agent Vidana then confirmed that she did not know if Defendant "was going to be in trouble afterwards." (*Id.* at 50); *see Boslau*, 632 F.3d at 428–29 (holding that the mere fact that an officer may have elicited a confession through a variety of tactics including "making false promises" and "deceiving the suspect," does not necessarily render a confession involuntary). Again, the assurances made by the agents is just one factor to be considered within the totality of circumstances. *Boslau*, 632 F.3d at 428–29.

circumstances analysis to determine whether, in the context of the non-custodial interview with law enforcement, "the facts surrounding this interview demonstrate that the authorities overbore [Defendant's] will and capacity for self-determination." *LeBrun*, 363 F.3d at 726. "This is a very demanding standard." *Id.* (finding that the facts of the case did not rise to the level of the demanding standard that Defendant's will was overborne). Factors in the analysis include "the degree of police coercion, the length of the interrogation, its location, its continuity, and the defendant's maturity, education, physical condition, and mental condition." *Sheets v. Butera*, 389 F.3d 772, 779 (8th Cir. 2004).

      Here, the interview of Defendant was conducted in her own home, which the Eighth Circuit has observed to be a less "inherently coercive setting." *United States v. Williams*, 760 F.3d 811, 815 (8th Cir. 2014) (holding that when "a person is questioned on his own turf, we have observed repeatedly that the surroundings are not indicative of an inherently coercive setting") (citations and quotations omitted). Further, Defendant's fiancé remained close by and testified that he heard 95 percent of the interview. *See Boslau*, 632 F.3d at 429 (reasoning in part that because defendant had a companion lending support during the interview, defendant's will was not overborne). In addition, as was the case in *Boslau*, "the [agents] were not physically aggressive towards [Defendant] and they did not create any more psychological pressure than is commonly associated with interrogations." *Id.* Nor did the agents wear down Defendant's "will with persistent questioning over a considerable length of time." *LeBrun*, 363 F.3d at 726. The agents also did not yell, scream, make threats, raise their voices, or point any weapons during their

12

interview of Defendant. *See, e.g.*, *United States v. Rank*, No., 3:18-CR-30013(02)-RAL, 2018 WL 4334067, *3 (D.S.D. May 17, 2018), *report and recommendation adopted*, 2018 WL 3062911 (D.S.D. June 18, 2018).[4] To the contrary, Mr. Acosta testified that interview was "fairly friendly." (Tr. 69.)

In her reply, Defendant argues that because she "had no prior experience or knowledge of the criminal justice process," she was more susceptible to coercion. (Def.'s Reply 6.) A defendant's prior experience with the criminal justice system is another factor that weighs in favor of voluntariness. *See*, *e.g.*, *Brave Heart*, 397 F.3d at 1041. Defendant was a twenty-nine-year-old adult and apparently of average intelligence, fully capable of considering her responses to the agents' questions. *See LeBrun*, 363 F.3d at 726 ("Generally, we have concluded that where the defendant possessed at least average intelligence, then his inculpatory statements were not compelled."). Additionally, by the

---

[4] In its brief, the Government's relies on *United States v. Rank* for its argument that an agent's assurances that a defendant is "not in trouble" do not rise to the level of overbearing a defendant's will. (Gov't. Resp. 12.) Defendant argues that *Rank* is unpersuasive because the decision is unpublished, nonbinding, and distinguishable. (Doc. No. 162, Def.'s Reply Mem. in Supp. of Mot. to Suppress Statements ("Def.'s Reply") 8.) This Court agrees that *Rank* is not precedential law; however, while *Rank*'s totality of the circumstances analysis is unique, *Rank* confirms in situations similar to this one that when agents assure a defendant during an interview of her at her home that she is "not in trouble" and will "not be arrested," those assurances alone do not render a defendant's statements made to law enforcement per se involuntary. *See LeBrun*, 363 F.3d at 725 (holding that a promise is "merely one factor" to be considered in the totality of circumstances); *Kilgore*, 58 F.3d at 353 (holding that where assurances are made that a defendant will not go to jail if he confesses, such a circumstance alone does "not make [the defendant's] confession involuntary") (citing *Sumpter v. Nix*, 863 F.2d 563, 565 (8th Cir. 1988) ("[The defendant's] allegation that his interrogators made implied promises of leniency and treatment for alcoholism if he were to confess, while more serious, also do not render [the defendant's] confession involuntary.")).

time the agents began asking Defendant questions, Defendant had calmed and gained her composure, and there was no indication she could not understand their questions. *Brave Heart*, 397 F.3d at 1041 (noting that the fact that defendant "did not have difficulty understanding the questions put to him" weighed "in favor of the voluntariness of his confession"). Nor is there evidence that Defendant was intoxicated or fatigued such that she would have been more susceptible to coercion. *See United States v. Gaddy*, 532 F.3d 783, 788 (8th Cir. 2008).

Finally, in further examining Defendant's susceptibility to coercion, Defendant denied the agents' request to search her home office and computer at the end of the interview. (Tr. 54–55, 56.)[5] Following her refusal, the agents did not try to talk Defendant out of her denial but instead left the house. (Tr. 40, 55.) Defendant's invocation of her right in response to the agents' request is "strong evidence" that a defendant's will was not overborne. *United States v. Hallford*, 816 F.3d 850, 859 (D.C. Cir. 2016).

## III.  CONCLUSION

Having carefully reviewed the record and after considering the agents' assurances in context of the totality of circumstances, this Court finds that Defendant's will was not overborne. Thus, this Court finds the Government has met its burden of proving by a preponderance of evidence that Defendant's statements were voluntary.

---

[5]  The Court confirmed that when Agent Vidana and the other agents left, "up until then [Defendant] had expressly denied [the agents'] request for her to let [them] search her home office." (Tr. 55.)

## RECOMMENDATION

Based on the files, records, and proceedings herein, and for the reasons stated above, **IT IS HEREBY RECOMMENDED** that Defendant's Motion to Suppress Statements (Doc. No. 130) be **DENIED**.

Date:  February 23, 2022

                                         *s/ Becky R. Thorson*
                                         BECKY R. THORSON
                                         United States Magistrate Judge

## NOTICE

**Filing Objections:** This Report and Recommendation is not an order or judgment of the District Court and is therefore not appealable directly to the Eighth Circuit Court of Appeals. Under Local Rule 72.2(b), any party may file and serve specific written objections to this Report and Recommendation by **March 9, 2022**. A party may respond to those objections by **March 23, 2022**. All objections and responses must comply with the word or line limits set forth in LR 72.2(c).

**Under Advisement Date:** This Report and Recommendation will be considered under advisement 7 days from the date of its filing. If timely objections are filed, this Report will be considered under advisement from the earlier of: (1) 7 days after the objections are filed; or (2) from the date a timely response is filed.