UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---

UNITED STATES OF AMERICA,

                               Plaintiff,

v.

SIARRA IRIS DAWN GALLEGOS,

                               Defendant.

Criminal No. 20-233(3) (JRT/BRT)

MEMORANDUM OPINION AND ORDER
ADOPTING REPORT AND
RECOMMENDATION

---

Melinda A. Williams, Harry Jacobs, and Joseph H. Thompson, **UNITED STATES ATTORNEY'S OFFICE**, 300 South Fourth Street, Suite 600, Minneapolis, MN 55415, for plaintiff.

Jordan S. Kushner, **LAW OFFICE OF JORDAN S. KUSHNER**, 431 South Seventh Street, Suite 2446, Minneapolis, MN 55415, for defendant.

Defendant Siarra Gallegos is charged with wire fraud and conspiracy to commit wire fraud. Gallegos filed a Motion to Suppress Statements she made to law enforcement officers. After a hearing and additional briefing by the parties, Magistrate Judge Becky Thorson issued a Report and Recommendation ("R&R"), recommending that Gallegos's Motion be denied. Gallegos objected to this recommendation. Because the Court finds that under the totality of the circumstances Gallegos voluntarily made the statements, the Court will overrule Gallegos's objection, adopt the R&R, and deny the Motion.

**BACKGROUND**

**I.     FACTUAL BACKGROUND**

There are no objections to the factual statements contained in the Magistrate Judge's R&R, which the Court adopts and summarizes here. (R&R at 3–7, Feb. 23, 2022, Docket No. 167.)

On February 19, 2020, Federal Bureau of Investigation ("FBI") Special Agents Jazmin Vidana ("SA Vidana") and Scott Zelesnikar ("SA Zelesnikar") went to Gallegos's residence to interview her and request consent to search her home office in Hemet, California. (Oct. 19, 2021 Hr'g Tr. at 24–26, Nov. 2, 2021, Docket No. 141.) The agents did not have a search warrant or an arrest warrant. (*Id.* at 25, 31.) They went to interview Gallegos at the request of the case's lead investigative agents in Minnesota who also provided them with a list of questions. (*Id.*) SA Vidana testified that at the time of the interview she did not know if Gallegos was a target of the investigation or whether Gallegos would be charged, only that she would not be arrested on the day of the interview. (*Id.* at 48–50.)

SA Vidana and SA Zelesnikar were accompanied by two other FBI agents and a Postal Inspector. (*Id.* at 26.) These additional agents were present to assist with a search if Gallegos consented to it. (*Id.*) They wore windbreaker jackets identifying their law enforcement agencies, and kept their weapons concealed the entire time. (*Id.* at 27–28, 70.)

SA Vidana and SA Zelesnikar knocked and then rang the doorbell. (*Id.* at 62.) Gallegos's fiancé, Thaddeus Acosta, opened the door and saw the agents at the door and in the yard. (*Id.*) Acosta asked the agents why they were there, and the agents told him that they were there to speak with Gallegos about her employment. (*Id.* at 63.) Acosta testified that he asked the agents if Gallegos "was in any kind of trouble," and they responded that she was not. (*Id.*) Acosta asked the agents if he could close the door while he went to speak with Gallegos and the agents told him that he could. (*Id.*)

Acosta went upstairs to let Gallegos know that FBI agents were there and wanted to speak with her about her employment. (*Id.*) According to Acosta, Gallegos "was pretty alarmed," and he told her to calm down. (*Id.*) He told her that the agents had told him that she was not in trouble and it seemed like they just wanted to ask her some questions. (*Id.* at 63, 66–67.) Acosta and Gallegos returned to the door, taking about one minute for her to get to it. (*Id.* at 63–64.)

When she got to the door, the agents introduced themselves and told her they wanted to ask her some questions. (*Id.* at 29.) SA Vidana testified that Gallegos appeared "very nervous to see us," her hands shook, "her voice was very shaky," it "looked like she was going to tear up or cry," and that "her thoughts seemed very scattered." (*Id.*; *see also id.* at 45.) SA Vidana indicated that based on her experience with similar interviews that Gallegos was "very typically nervous just like anyone would be if they opened their door in the morning and saw FBI agents standing there" and that she was "high on the

nervous scale" but not overly or uniquely nervous.  (*Id.* at 42, 44–45.)  Acosta testified that Gallegos appeared nervous, "[s]tartled and scared."  (*Id.* at 65.)

Noticing how nervous Gallegos appeared, the agents asked her to step outside, sit down, and take a deep breath.  (*Id.* at 29–30.)  SA Vidana told her that everything was going to be okay and that they just wanted to ask her some questions.  (*Id.* at 30.)  The agents told her that she was not going to arrested and that she was not in trouble.  (*Id.* at 30–31, 46–47.)  Gallegos stepped outside.  (*Id.* at 64.)  Acosta then asked if they could "come inside because it was quite the scene in our front yard."  (*Id.*)

They went into the living room that was just inside the front door.  (*Id.* at 32.)  SA Vidana and SA Zelesnikar sat down while the other agents stood throughout the living room.  (*Id.*)  The living room is a large, open room with a stairway to the second floor near the kitchen.  (*Id.* at 38.)  According to SA Vidana, once they sat down in the living room, Gallegos "seemed a lot more relaxed."  (*Id.* at 33.)  SA Vidana and SA Zelesnikar then began their interview of Gallegos.  (*Id.*)

SA Vidana remembers that Acosta was present for most of the interview to try to comfort Gallegos, but that at times he was in the kitchen.  (*Id.* at 34–35.)  SA Vidana allowed Acosta to remain there to keep Gallegos comfortable.  (*Id.* at 35.)  Acosta testified that one of the agents "led" Acosta away from the living room into the kitchen.  (*Id.* at 72.)  Although the agent did not physically lead him away, it seemed to Acosta that the agent wanted to drag him out of the room to keep him from hearing the interview, but

he kept listening. (*Id.* at 64.) According to Acosta, he was in the kitchen for most of the interview but could hear "95 percent" of it. (*Id.* at 72.) Acosta did not answer any questions. (*Id.* at 34.)

According to Acosta, the agents told Gallegos multiple times that she was not in trouble because the agents seemed "insistent on relaxing her to the point where she was comfortable talking." (*Id.* at 64–66.) SA Vidana agreed that although she could not remember for sure, she and SA Zelesnikar may have told Gallegos several times that she was not in trouble and that they understood she was just doing her job. (*Id.* at 53.) Acosta believes this calmed Gallegos down. (*Id.* at 66.) Acosta testified that after the agents told Gallegos she was not in trouble that "she was willing to speak with them without really being scared." (*Id.* at 66, 71.)

Gallegos answered most or all the agents' questions. (*Id.* at 39, 51–52.) According to SA Vidana, the interview was "casual," "normal," and did not involve much "pushing." (*Id.* at 34.) SA Vidana thought Gallegos and Acosta were "very courteous" to the agents. (*Id.* at 33.) Acosta testified that the interview was "fairly friendly," and no one was disrespectful, though there were times SA Vidana's tone was rude when asking questions. (*Id.* at 69, 73–74.)

SA Vidana testified that no one blocked the door. (*Id.* at 32–33.) According to SA Vidana, they told Gallegos that she did not have to answer any question she did not want to answer. (*Id.* at 39.) At no point did anyone raise their voice, yell, or threaten Gallegos

-5-

or Acosta. (*Id.* at 33–34, 70.) SA Vidana testified that no one told Gallegos or Acosta that they had to speak with the agents or that they could not leave or stop the interview and that they told Gallegos the interview was "voluntary." (*Id.* at 33, 38–39.) Acosta agreed that no one told them or implied that they could not leave, but he testified he never heard them say it was voluntary or that Gallegos could terminate the interview. (*Id.* at 70–71.)

During the interview, Gallegos identified her voice on four recorded phone calls and provided information about her work and job. (*Id.* at 39.) She denied committing fraud. (*Id.*)

At the end of the interview, the agents asked Gallegos if she would consent to a search of her home office. (*Id.* at 40, 54–56.) Gallegos expressly refused to consent, and the agents did not search the home. (*Id.* at 40, 55.) The agents left the house and did not arrest Gallegos that day. (*Id.* at 69.)

**II.    PROCEDURAL BACKGROUND**

Gallegos was indicted on one count of conspiracy to commit wire fraud in violation of 18 U.S.C. §§ 1349 and 2326 and on five counts of wire fraud in violation of 18 U.S.C. §§ 1343 and 2326. (Indictment, Oct. 20, 2020, Docket No. 1.) Gallegos moved to suppress the statements she made during the February 19, 2020 interview. (Mot. Suppress Statements, Aug. 16, 2021, Docket No. 130.) On October 19, 2021, then-Magistrate Judge Katherine Menendez held a hearing on the Motion. (Min. Entry, Oct. 19, 2021, Docket No. 138). The parties then filed post-hearing briefs. (Def.'s Mem. Supp., Dec. 1, 2021,

Docket No. 144; Gov't's Resp. Opp., Jan. 14, 2022, Docket No. 161; Def.'s Reply Mem., Jan. 24, 2022, Docket No. 162.) Magistrate Judge Becky Thorson issued an R&R recommending the Court deny Gallegos's Motion to Suppress.[1] (R&R, Feb. 23, 2022, Docket No. 167.) Gallegos objected to the R&R. (Def.'s Obj. R&R, Mar. 9, 2022, Docket No. 176.)

## DISCUSSION

### I. STANDARD OF REVIEW

After an R&R is filed by a magistrate judge, "a party may serve and file specific written objections to the proposed findings and recommendations." Fed. R. Crim. P. 59(b)(2); *accord* 28 U.S.C. § 636(b)(1); D. Minn. LR 72.2(b)(1). For a dispositive matter, such as a motion to suppress evidence, "[t]he district judge must consider de novo any objection to the magistrate judge's recommendation." Fed. R. Crim. P. 59(b)(1), (3); *accord* 28 U.S.C. § 636(b)(1); D. Minn. LR 72.2(b).

---

[1] In the midst of briefing on the Motion, Judge Menendez was confirmed as a District Judge and the case was reassigned to Magistrate Judge Thorson. (Notice of Reassignment, Dec. 22, 2021, Docket No. 150.) Magistrate Judge Thorson allowed the parties to file a letter brief if the parties wished to request a new hearing. (Order, Dec. 28, 2021, Docket No. 154.) Gallegos opposed an additional hearing but requested that Judge Menendez decide the Motion as she observed the testimony. (Letter to Magistrate Judge, Jan. 3, 2022, Docket No. 155.)

Magistrate Judge Thorson agreed that another hearing was unnecessary but denied Gallegos's request that Judge Menendez resolve the Motion. No party has objected to these decisions. The Court will uphold these unobjected to decisions as they are not clearly erroneous. *Cf. United States v. Heying*, No. 14-30, 2014 WL 5286155, at *3 (D. Minn. Oct. 15, 2014) (defining the standard of review when no objection is filed).

## II.   ANALYSIS

An involuntarily made statement is inadmissible against the person who made the statement.  U.S. Const. amend. V.  The United States bears the burden of proving by a preponderance of the evidence that statements were voluntarily made.  *United States v. Boslau*, 632 F.3d 422, 429 (8th Cir. 2011).  "A statement is involuntary when it is extracted by threats, violence, or express or implied promises sufficient to overbear the defendant's will and critically impair [her] capacity for self-determination."  *United States v. Sandell*, 27 F.4th 625, 630 (8th Cir. 2022) (quoting *United States v. Roberts*, 975 F.3d 709, 718 (8th Cir. 2020), *cert. denied*, 141 S. Ct. 2822 (2021)).  Courts determine if a defendant's will has been overborne by examining the totality of the circumstances, including both the conduct of law enforcement and the characteristics of the defendant.  *Id.*  A non-exhaustive list of factors used to make this determination includes "the degree of police coercion, the length of the interrogation, its location, its continuity, and the defendant's maturity, education, physical condition, and mental condition."  *Id.* (quotation omitted).  The totality of the circumstances is evaluated based "on the objective circumstances of the interrogation, not on the subjective views harbored by either the interrogating officers or the person being questioned."  *United States v. LeBrun*, 363 F.3d 715, 720 (8th Cir. 2004).  Finding that law enforcement officers overbore a defendant's "will and capacity for self-determination . . . is a very demanding standard."  *Id.* at 726.

Gallegos argues that her statements should be suppressed as involuntary because the agents overbore her will by deliberately misleading her with promises that she was not in trouble and that because of these promises she participated in the interview.[2]

A promise made during an interrogation is just one factor in determining whether a statement was voluntary. *LeBrun*, 363 F.3d at 725. Even if the Court assumes a reasonable person would view the agents' statements as promises of leniency, it "does not render a confession involuntary per se." *Simmons v. Bowersox*, 235 F.3d 1124, 1133 (8th Cir. 2001). And if Gallegos would not have participated in the interview absent the statements, this alone is still insufficient to render her will overborne. *See LeBrun*, 363 F.3d at 725 ("Thus, it is not enough to show that the authorities' representations were the but-for cause of a confession.") Therefore, the Court must consider the totality of the circumstances.

Little else in the record suggests that Gallegos's statements were involuntarily made. It is undisputed that Gallegos was not in custody. The interview was conducted in Gallegos's house which is not indicative of a coercive environment. *See United States v. Williams*, 760 F.3d 811, 815 (8th Cir. 2014). The agents did not demand to come into the house. Instead, they allowed Acosta to close the door with them outside as he went to

---

[2] Because, as discussed below, the Court finds that under the totality of the circumstances Gallegos's statements were not involuntary even if the agents deliberately misled Gallegos and she would not have otherwise participated, the Court need not decide whether the agents in fact deliberately misled Gallegos or whether the statements were the but-for cause of her participation in the interview.

speak to Gallegos. When Gallegos moved outside, Acosta invited the agents into the house. The agents did not direct anyone's movement in the house. The room where the agents conducted the interview was a large room with multiple exits including one out of the house, and it is undisputed that the agents never blocked the door or indicated that Gallegos could not leave. Moreover, the agents do not appear to have restricted Gallegos's movement.

Although there is some dispute in the record as to whether the agents specifically told Gallegos that her participation was voluntary, that she could terminate the interview, and that she could refuse to answer, it is undisputed that the conversation was generally friendly and cordial with at most moments of rudeness and that the agents never raised their voice, threatened anyone, or acted aggressively at any time. Additionally, Acosta was close by throughout the interview, and nothing indicates the interview was abnormally lengthy.

These facts weigh in favor of finding that Gallegos's will was not overborne. *See Boslau*, 632 F.3d at 429 (statements voluntarily made during interrogation of adult of average intelligence in presence of companion despite possible offer of leniency); *LeBrun*, 363 F.3d at 726; *see also United States v. Axsom*, 289 F.3d 496, 502 (8th Cir. 2002) (holding that the presence of nine officers participating in the execution of a search warrant with two conducting an interview is not necessarily police dominated).

The totality of Gallegos's personal characteristics also does not weigh in favor of finding that her will was overborne.  The only personal characteristic in the record that may weigh in favor of finding that her statements were involuntary was her lack of experience with the criminal justice system.  *See Sandell*, 27 F.4th at 630 (noting that a history of interaction with the criminal justice system may support an inference that statements to law enforcement are voluntary).  On the other hand, Gallegos was an adult, and nothing indicates she was not of at least average intelligence nor that she was unable to comprehend the agents' questions or to fully consider her responses.  It is also undisputed that Gallegos was calmer during the interview than during the initial interaction with police.  These considerations support a finding that her statements were voluntary.  *See LeBrun*, 363 F.3d at 715 ("Generally, we have concluded that where the defendant possessed at least average intelligence, then his inculpatory statements were not compelled."); *United States v. Brave Heart*, 397 F.3d 1035, 1041 (8th Cir. 2005) (noting that a defendant's ability to understand questions weighs in favor of voluntariness).

Gallegos also expressly denied the agents' request to search her home office at the end of the interview.  Gallegos's refusal to allow the agents to search her home office further weighs in favor of a finding that her will was not overborne.  *See United States v. Hallford*, 816 F.3d 850, 859 (D.C. Cir. 2016).

Thus, even if the Court assumes that the agents made deliberately misleading statements that Gallegos was not in trouble, that alone is insufficient to render her

-11-

statements involuntary.³ The Eighth Circuit has held in several cases that statements are not involuntary even though law enforcement officers made misleading statements of leniency or other assistance. *E.g.*, *Roberts*, 975 F.3d at 718; *Brave Heart*, 397 F.3d at 1041; *LeBrun*, 363 F.3d at 725–27; *United States v. Astello*, 241 F.3d 965, 967–68 (8th Cir. 2001); *Simmons*, 235 F.3d at 1133–34. Although there are some factual differences with these cases, the totality of the circumstances here show that a reasonable person's will would not have been overborne.

In sum, because Gallegos's statements were voluntarily made, the Court will overrule Gallegos's Objection, adopt the R&R, and deny the Motion to Suppress.

**ORDER**

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that:

1. Defendant's Objection to the Report and Recommendation [Docket No. 176] is **OVERRULED**;

2. The Magistrate Judge's Report and Recommendation [Docket No. 167] is **ADOPTED**; and

3. Defendant's Motion to Suppress Statements, Admissions, and Answers [Docket No. 130] is **DENIED**.

---

³ Although the Court finds that the generic statements the agents made here are insufficient to render Gallegos's statements involuntary under the totality of the present circumstances, the Court's Order should not be interpreted as holding that law enforcement promises alone—such as more specific promises akin to a grant of immunity—are never sufficient to violate the Fifth Amendment even in contexts otherwise similar to this one.

DATED:  June 2, 2022
at Minneapolis, Minnesota.

                                                                      JOHN R. TUNHEIM
                                                                           Chief Judge
                                                             United States District Court